Good morning, your honors. John Burton and with me is Peter Williamson for the plaintiffs. The issue in this particular case is extremely narrow. This is a pure products liability case that is governed by California law. There are no law enforcement parties remaining in the case. And the question is whether in this de novo review of a summary judgment granted in the district court, viewing the evidence in the light most favorable to the plaintiff, etc., there is adequate evidence in the record to support a jury finding that the risk of death through cardiac arrest caused by metabolic acidosis induced by multiple applications of the taser electrical current was scientifically knowable in the relevant time period. Now the relevant time period here is subject to some discussion. The product, the M26, was introduced in about the year 2000. The M26s that were used in this incident were shipped to the Seaside Police Department in 2003. The incident itself happened in August of 2004. California law imposes a continuing duty to warn. We would say the relevant date is August of 2004. It doesn't make a lot of difference because during that period there was virtually no research done and there were no peer-reviewed articles that were published on the risk of taser X26s and M26s in general, and in particular acidosis. Well, there were warnings, of course, which is a duty-to-warn case, but your position, of course, is probably that the warnings actually given were inadequate based on what? Well, they were just very general warnings that said confrontations between police officers and suspects are inherently dangerous and force is inherently dangerous. There was absolutely no warning whatsoever that repeated, multiple, or prolonged applications of the device could raise the blood acid to a dangerous level and induce cardiac arrest. Now, there were two subsequent warnings given, if I could address that very briefly. In June of 2005, there was a warning that I understand will be at issue in the next case, because that arose in 2007, that did for the first time expressly warn that there may be dangers associated with repeated or multiple applications of the device, although those went to breathing impairment rather than acidosis. And then finally in September of 2009, taser gave an express warning that repeated, multiple, or prolonged applications of the device can raise blood acid, induce metabolic acidosis, and cause cardiac arrest. So let me just go back and make sure I understand. Is there one claim or are there multiple theories here? You started by saying we're now down to a products liability case under California law. Is that a strict liability theory? Is that your only remaining claim, or do you still have negligence-based claims also? No, negligence and strict liability for products. Okay. I just wanted to be sure I understood that you still have those two lines of argument. Yes, and they're very similar, and I guess they're also somewhat different. Strict liability requires proof or evidence that a risk was scientifically knowable at the time and that there was no warning given. Negligence phrases it that the manufacturer in the exercise of due care would have known or should have known about the risk and failed to give the warning. But there was no warning given. The very general warnings, like, are not specifically addressed to this at all, and I would suggest that the absence of an adequate warning is established for the purpose of this litigation by collateral estoppel in the Heston case, where an incident five months later involved extremely similar facts. Well, it's good news and bad news if you do that, because the jury found against the plaintiff on the strict liability claim in that case in a special verdict. I mean, it answered the two questions differently. The negligence claim, the Heston jury found in favor of the plaintiff, but on strict liability found against the plaintiff on the knowable question, which seemed odd to me, but that is how I understood the verdict. It was odd, and being counsel in both cases, I understand that sometimes jurors are making deals in horse trading and understanding results. Also, I thought it was interesting in that case that the jury was upset enough about the evidence that they had heard to assess a $5 million punitive damage award against Taser. I guess I have two questions for you, and one is, if there's a estoppel, does it operate against you on the strict liability? In other words, do you get to just ratchet it in one direction, or would the whole entire verdict come in? And the second question is whether you appropriately raised this issue, both in the district court when the other verdict came in, and in this court in your opening brief. Thank you, Judge Graber. I'd like to address both of those in order. The first is that absolutely estoppel cannot be asserted against the Rosas, simply because they were not parties in that case. So it's a one-way street. It's absolutely a one-way street in this situation. One of the parties here, Taser International, was a party in that litigation, actually litigated. The other party, the Rosas, was not a party to that litigation and did not actually litigate it. Number two, in terms of raising it, obviously we were aware of the Heston case, and obviously it's mentioned in the district court's order. The reason it was not collateral estoppel at the time is that California law, well, federal law instructs that when California law provides the rule of decision, like in the diversity case, which this essentially was, although we were there on supplemental jurisdiction as well, one looks to the law of the state that provides the substantive law. That's the federal rule. And California provides that judgments do not become final until they're affirmed on appeal. That's a minority rule among jurisdictions and states in the United States, but it is a California rule. We were very conscious of that rule. We, in fact, asked this Court to delay briefing until the Heston appeal was decided. Which was in, what, May of 2011, approximately? Was it 2010 or 2011? Well, it was, I'm not sure. It was in May, I remember. It was decided on May 5, 2011. Thank you. So what, how did you raise it to this Court before today? In our opening brief, we raised it, which was our first opportunity to raise it. And we raised it explicitly on the issue that Judge O'Scanlan raised, which was whether there was an adequate warning. Because if there was no adequate warning in February of 2005 when Mr. Heston died, there certainly was no adequate warning in August of 2004 when Mr. Rosa died. Now, there are other things that happened between those two incidents, which would make other issues in the case perhaps not collateral estoppel. In particular, in November of 2004, Dr. Yoshim issued his study, which showed scientifically that multiple and prolonged applications of Taser electrical current induced severe acidosis in test animals. And that scientifically revealed for the first time what should have been known when this device was put on the market, which is that, and this is very, very basic medicine and physiology, Your Honors. Muscle contractions, whether they're voluntary, like when we exercise or lift weights, or whether they're induced by electrical current by the Taser ECD, causes muscle contractions, which discharges lactic acid into the bloodstream. And it's a very basic physiological fact that excess blood acid, and we're talking about lactic acid from muscles, which is metabolic acidosis, that a severe increase in metabolic acidosis can trigger a cardiac arrest, especially in a person who is excited, who has a lot of adrenaline on board, and has a lot of other things going on. And that's been known for decades. And in 1999, there was a scientific study that we cited to the district court, and again to this court, that showed a link between severe metabolic acidosis or severe acidosis and sudden in-custody deaths and cardiac arrests in this police situation. And Taser agrees that Mr. Rosa's cardiac arrest was caused by acidosis. So there's no dispute between the parties on that. The only dispute between the parties is whether or not the Taser applications, and here there was 50 seconds of current minimum given to Mr. Rosa through 10 discharges at least, that whether that elevated his acidosis significantly such that the repeated Taser applications were a substantial factor in his cardiac arrest. When is the first publicly available study available? My notes suggest 2006. Is that right? The 2006 was the date of the publication of the Yoshim article. However, Yoshim presented his studies in November of 2004, and the Taser people and Rick Smith will acknowledge that they were at that conference and they heard in 2004, which was about two months after this incident, that Dr. Yoshim had made these discoveries, or not made these discoveries, but actually empirically proved what was hypothesized before then, which is that the severe Now let me see if I understand your argument. You're saying that the conference was in December of 2004, but the death in this case was August 29th of 2004. Right. So it was subsequent to the death, and subsequent by at least a year to the manufacturer of this particular M26. That's correct. However, it was scientifically knowable prior to that. Our position is that it's not a defense for a manufacturer to stick his head in the sand like an ostrich to ignore what are known logical scientific risks of a device, and then put something on the market and put it in the hands of police officers without a warning when testing could have been done and no testing was done. I mean, this device, let me just explain one thing to the court. I think it's extremely important. If you pull the trigger, it fires for five seconds. However, the trigger can be held down and it will continue to discharge, and it can be repeated while the barbs are already impaled into the person, essentially indefinitely. There was absolutely no testing whatsoever on safety concerns for these repeated applications. Only five-second testing, and that was very minimal. None of it was peer-reviewed or published. And so they recklessly put this device on the market without testing, despite warnings, one of which was published in The Lancet, that people who had died from the earlier, less powerful taser devices might be dying because of this metabolic acidosis. Now, has the metabolic acidosis become more crucial in the case of someone who has ingested methamphetamine, which is what was here? I would say a person who has ingested methamphetamine would be more vulnerable to, he would already have some degree of acidosis, he would already have some degree of irritability of the heart, and therefore the acidosis would provide a greater risk. Do you think that tasers should have warned with respect to that risk as well? Absolutely. And that's exactly what they do today. They put those warnings in effect in September of 2009. I see I only have a minute remaining. That went quickly. I'd like to reserve. That's fine, counsel. Thank you. We'll hear from taser. Thank you, Your Honors. May it please the Court. My name is John Maley, Counsel for Taser International. I respectfully request that Judge Fogle properly enter summary judgment, and that should be affirmed, on a number of grounds, both those that were addressed by Judge Fogle after thorough briefing and oral argument, and those that he did not need to reach, such as causation. First, as to known or knowable, there's no dispute that California law requires the generally recognized prevailing science and medicine to be established before there's a duty to warn, whether that's in negligence or strict liability, and that simply did not exist as of both the time of distribution, December 2003, and the incident date, August 29, 2004. Counsel, what effect, if any, should the jury verdict in Heston have where that issue went to the jury, Both the strict liability and the negligence, negligent failure to warn claims went to the jury in that case, and the jury, in fact, found that the, on the negligence claim, found against taser, and that a reasonably prudent manufacturer in its position failed to warn adequately. Yes, Your Honor. It should have no effect in this case for several reasons. First of all, it is plaintiff's burden in this case, the Rosa case, if they're going to try to inject collateral estoppel, which is described as a risky doctrine, that's discretionary for a district judge. It's their burden to present that timely and properly. They have not done that. They never. Well, the district judge was aware of it because the decision discussed it. He was aware of the case, but this doctrine that was advocated for the first time in three paragraphs in Appellant's opening brief in this reviewing court was not advocated below. Well, let me sort of tease that out, because three paragraphs can be enough, depending on what the three paragraphs say. So I'm not sure what the three paragraphs was about. But what about this issue of that the judgment wasn't final until this Court's decision in May of 2011, I guess it was? So the timing, Your Honor, is that the verdict was in 2008 in Heston, and then the judgment was entered January 30, 2009. And it was upheld on appeal in May of 2011. That is correct. Now, in the interim, after judgment was entered by the district court in Heston, it was in the fall of 2009 that this case, Rosa case, was being moving towards trial. Summary judgment was filed, response brief from plaintiff in October of 2009, argued before Judge Fogel in November of 2009, and he entered summary judgment then in November of 2009. During that entire period of time, the only thing that counsel advocated to Judge Fogel below was that, well, there's another case, Heston over here, and we think that this should go to the jury as well. There was never the words collateral estoppel uttered, never, in the Rosa case, in the briefing or in the oral argument that's of record. That's significant. Then what happens on appeal, if a district judge, if they're going to invoke collateral estoppel, it's discretionary, then reviewed discretionarily. Well, this is an odd situation, because there was no to be collateral estoppel has to be a final judgment, does there not? So that since it didn't come down until last spring, it's a little hard to say, well, they shouldn't have argued that there was a final judgment in the district court. I mean, would you, it seems to me, just speaking for myself, that the most you could ask would be that we could send it back so that the district court looks at the collateral estoppel, but it seems to be an issue of law that we could look at as well. Well, respectfully, it would still, it's being raised, the way it's been raised for the first time here is in this appellate brief and now in appellate argument. And there's not been a sufficient development of what the specific issue is. For instance, in footnote 10. But you couldn't, when should it have been raised if it's a final, if you require a final judgment in order to argue? The case law says at the earliest opportunity available. Now, when the judgment was entered in January of 2009, and as this case was moving along, the Rosa case, there were many options available. Stay the case, stay the Rosa case, file something asking for collateral estoppel, or with this appeal, do something, for instance, that specifically puts the record before the court. This court is being asked to imply estoppel without knowing what the warning precisely is. There were five different devices in Heston, different distribution dates, subsequent incident date in 2005. So, and then in their reply brief in this court, plaintiffs say, footnote 10, they're not asking this court to apply collateral estoppel to the state of scientific knowledge issue. But that's what this case is about. This case, this warnings case, deals exclusively with what was the normal. Well, they're not because it was a split maybe by the Heston jury, I guess. But as I understand it, you're saying that we don't have to grapple with that if we ---- There's multiple reasons why not to grapple with that. First of all, in terms of being raised and properly raised, it is not properly before this court, because they've not provided this court with a basis to assess what is being precluded, because there are different devices, different warnings, different time frames, different sequences. And then we do go to what is admittedly odd, is that if you're going to apply collateral estoppel, and you have a jury finding that actually says, we find the jury found that Taser didn't know or should have known through the available scientific knowledge that prolonged exposure potentially causes acidosis. And that's consistent with even today. Well, I don't ---- I have a hard time squaring their answer to question 13 with their answer to question 16 on the state of knowledge. All the more reason, Your Honor, respectfully to not apply collateral estoppel. Beyond that, if we go to what was before the court in this case and what's on review, which is what is the adequacy of the warning, what is the state of scientific knowledge, and then causation, which was also set forth, it is still today not, under California law, the prevailing general scientific and medical knowledge that application of these devices causes dangerous metabolic acidosis. Do we have to agree with you on that for you to win? No, Your Honor. But that is a separate, independent basis, the causation basis. Well, but on the causation basis, there's a difference between what is ---- well, it seems to me there's a difference between what is demonstrated about causation in this individual case and whether there is scientific evidence that there could be causation in some case. General versus ---- Right. Yes, Your Honor, general versus specific causation. On the causation front, days of summary judgment was properly entered and affirmed on both those grounds because the record is, again, at the time of application, November or August 29, 2004, it was not the generally prevailing science and medicine established that these devices would cause this. And even today, if the case were tried today, that's still the case. Well, that's the part that I'm saying. I'm not sure, just speaking for myself, I'm not sure I agree with you on what the state of knowledge is today, but that isn't really relevant to this case. Only if the court gets the causation is it relevant. And I respectfully submit the court to the sidings of the Ho, Vilke, and the Bozeman articles, as well as the National Institutes of Justice in 2011 that we've cited in our briefing that specifically says it's not established that these devices cause dangerous metabolic acidosis in humans. It's simply the science isn't there. And we don't ---- the law lags science. We don't give six jurors this issue and say, you figure it out, when science has not gotten there. And the reason science hasn't gotten there is because the court was presented with two pieces of evidence, the Lancet and the Heap articles. They both said maybe acidosis because contractions and lack of breathing. Well, what science and the studies that Taser funded and others did confirmed is that the pigs that were tested laying on their backs and anesthetized do not breathe during exposure. We humans actually breathe and breathe more, which is an offset to contraction. We think about walking up the stairs. We start to get a little acidotic. We breathe harder. It's the human body addressing that. And that was not known back in 99 and 2001 and 2004. And even in November of 2004, Mr. Joshim's article still talks about breathing being an issue. Judge Fogle was correct. Humans breathe. Under application, that offsets the acidosis issue. So respectfully, Your Honors, there was no, under California law, no basis under negligence or strictly products liability for Taser to have warned. And thus, Judge Fogle properly entered summary judgment on that. Beyond that, if we go to causation. Are you conceding that the relevant date for that study is December of 2004, notwithstanding the fact it wasn't published until 2006, isn't it? Yes, it is of record that Taser learned of it at the conference in late 2004, which is still subsequent to the death as well as the manufacture of the drug. That is correct, Your Honor. And then subsequent studies have confirmed the breathing issue, that pigs don't breathe, they're anesthetized. Human studies, humans continue to breathe, actually increase their ventilation, which offsets, and so there's been no clinically significant acidosis in human studies. And Bozeman's article, Independent Epidemiological Study from 2009, says that whether it's for five, 15, or 45-second duration applications. So that's the state of the science, and the NIJ confirmed that in 2011. Beyond the warnings issue, there's a separate independent basis to affirm Judge Fogle's summary judgment that he need not reach because of the way he decided the case, but those are the causation issues. And even beyond general causation, in this case, with three times the level of lethal methamphetamine in Mr. Rosa, 1.73 methamphetamine with hypertrophy of his heart from prior undisputed, they had prior drug abuse that leads to heart damage. And what he was doing that night, through the neighborhood, jumping over fence, swinging a piece of a fence like a two-by-four, even wrestling, struggling with police while they were trying to handcuff him, is exertional, just as if in a wrestling match or running through a neighborhood. So he was already acidotic. The experts that plaintiff brought to bear could not state that absent the Taser device application, that he wouldn't have been in the same position. And those purported experts had no expertise in the physiology, the physiological effects of a Taser device on a human being. So they were not qualified and would not be able to testify under Rule 702 and Daubert and its progeny. Judge Fogle recognized that, for instance, with respect to the medical examiner, Dr. Hain, who said the cause of death was methamphetamine, likely contributory to the arrest and Taser, but then in deposition he said, I can't point to any science that would support that a Taser device applied to a human would increase acidosis to a deadly level. And I think lastly, and it's important to remember here, that what police are confronting in this situation is someone who clearly is in need of medical attention. The sooner that they, and there have been in-custody deaths going on throughout history, long before Taser International and it proprieted a device that can help people get restrained, going back hundreds and hundreds of years they've been in-custody deaths, whether it's schizophrenia and then different drugs. We read about them more because the media picks up on these cases. But the sooner that he is restrained, the more likely he is to be able to get prompt medical attention, because he's clearly in dangerous throes, death throes right there. So that's the importance of the device.  And the other thing I want to ask is just what we've been talking about the acidosis. But one thing that troubles me here is this repeated zapping that occurs, I think, in both cases. Was there anything with respect to that that should have been known or? No, Your Honor. It seems as if what the officers were trying to do was to make sure that he would stop moving. And so they just kept zapping and zapping and zapping. And in this case, Your Honor, a couple of things. First of all, when Mr. Rosen went over the fence, you know, not complying, the wires break. So that device was ineffective as he rolls down the hill. Then when he is down there, he's still, of course, in this drug-induced state. He's not corroborative. They are trying to cuff him. And so they're using physical force. The complaint alleges, and maybe it's the reason there was a settlement with the police, is that there was force used upon him such that he was bruised from physical force. So they're trying to get him restrained. They have to do that because the sooner he's restrained, the better chance he has, one, that he does not hurt himself or anyone else, and two, that he gets treatment. And again, even with the 45-second applications, as Bozeman found in his epidemiological study in 2009, there had been no deleterious effects found from the repeated exposures in terms of metabolic acidosis. So respectfully, Your Honor, for multiple reasons, Judge Fogle's summary judgment was correct on the warnings issue and should be affirmed on the other issues, and plaintiffs have not met their burden both procedurally, timing-wise, and on the merits to invoke collateral estoppel. Thank you, counsel. Thank you, Your Honor. Mr. Burton, you have just about a minute left. Excuse me if I talk quickly. I want to invite the Court's attention first to page 9 of the reply brief. This is the recent National Institute of Justice study that Mr. Maley just referenced, and this is a passage they didn't bring to the Court's attention. It says, as with rigorous exercise, the ECD causes muscle contraction that produce lactate in the blood. Lactate lowers the pH, making it more acidic. In extreme cases, the increase in blood acidity, referred to as acidosis, can lead to cardiac arrest. This is our case. So I think what Judge Schroeder is saying here about the repeated zappings is right on the money. What he said was that 15 seconds is okay. Fifteen seconds, the tests show 40% increase in blood acid level, which a human being who's breathing can tolerate. However, there was 50 seconds here. There were 10 applications at the bottom of the hill when Mr. Rosa was down and while he was being handcuffed. The bruising evidence, that's an allegation from the complaint that was not substantiated in discovery. And I'd like to just end finally with the correct standard here. It was misstated, I believe, during the argument, and it's cited on page 19 of the opening brief. And again, I apologize for talking quickly. And this is from two different Supreme Court cases, Carlin and Anderson. And it says, the rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. So it's not, as was suggested, that the actual risk be known and established. That would give anybody who is introducing a new product, like this was a new product, it was four times the power of the prior product, sort of a free ride to put something out and see, you know, who dies. Counsel, your time has expired. Thank you very much. Thank you. Thank you. The case just argued will be submitted for decision.
judges: Schroeder, O'scannlain, Graber